# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>vs.<br><br>ROBERT CULBERSON,<br><br>  Defendant. | 8:21CR192<br><br>FINDINGS AND RECOMMENDATION |

This matter is before the Court on the Amended Motion to Suppress (Filing No. 109) filed by Defendant, Robert Culberson. Defendant filed a brief (Filing No. 110) supporting the motion and the government filed a brief (Filing No. 112) in opposition.

An evidentiary hearing on the motion was held on April 14, 2022. Defendant was present at the hearing with his counsel, Peder Bartling. The government was represented by Assistant United States Attorney, Crystal Correa. Detective Andrew Ramsay ("Det. Ramsay"), Detective Mickey Larson ("Det. Larson"), and Detective Austin Taylor ("Det. Taylor"), all employed by the Omaha Police Department ("OPD"), testified at the hearing. The Court received into evidence Exhibits 1-5, 13, and 14 offered by the government, without objection, and Exhibits 6-12, over Defendant's foundation objection. The transcript of the hearing (TR.) was filed on April 27, 2022. (Filing No. 119). This matter is now fully submitted to the Court. For the following reasons, the undersigned magistrate judge recommends that Defendant's motion be denied.

## BACKGROUND

In October 2020, the OPD and FBI Safe Streets Task Force began a several-month joint investigation into a known gang member, Kashaun Lockett ("Kashaun"), after Det. Ramsay received information from a confidential informant ("CI") that Kashaun was selling large quantities of methamphetamine. Between October 2020 and May 2021, the task force conducted fourteen controlled buys of methamphetamine from Kashaun. (TR. 8-9). The task force also placed a stationary camera or "pole cam" to conduct video surveillance of Kashaun's residence and obtained authorization to intercept his cell phone. Throughout the course of the investigation,

task force members observed Defendant at Kashaun's residence 12 to 14 times and observed Defendant driving several rental vehicles on the premises. (TR. 9-10, 15-16, 32-33).

On April 30, 2021, the task force used a CI to arrange a purchase of two ounces of methamphetamine for $1400 from Kashaun. On this date, however, Kashaun was in the hospital recovering from a gang-related shooting that took place earlier in the month, and the CI ultimately obtained approximately 55 grams of methamphetamine from Kashaun's brother, Gary Lockett ("Gary"). (TR. 10-12). Det. Ramsay ran Gary's criminal history, which included gang violence and drugs. (TR. 22).

On May 25, 2021, the task force again used a CI to arrange a controlled buy of two ounces of methamphetamine for $1400 from Kashaun. In anticipation of the controlled buy, task force members maintained surveillance at Kashaun's residence as well as a restaurant set for the controlled buy. Prior to the controlled buy, task force members observed Kashaun leave his residence alone in a Chevy Silverado pickup truck and Defendant leave in a red Ford Mustang with out-of-state plates. The task force members conducting surveillance at the restaurant observed Kashaun and Defendant inside the restaurant together, but observed Kashaun exit the restaurant alone to complete the controlled buy in the parking lot with the CI as previously arranged. (TR. 12-14, 29-30). Later on the same date, task force officers intercepted a phone call placed between Kashaun and Defendant, during which Defendant asked Kashaun if "the bitch" ever came through "for the two." (Ex. 1 - Audio of Lockett-Culberson phone call). Det. Ramsay testified he believed Defendant was referring to the controlled buy for two ounces of methamphetamine that took place earlier that day. (TR. 14-15).

On June 14, 2021, the task force planned to set up a final controlled buy for half a pound of methamphetamine from Kashaun with the intent to effectuate his "takedown" before he arrived at the meet location. To that end, task force agents maintained surveillance on Kashaun's residence throughout the day on June 14, and observed Kashaun, Gary, and Defendant at the residence together. At approximately 2:35 p.m., Kashaun was observed leaving the residence alone in a red Mustang. Some agents maintained aerial surveillance of Kashaun's vehicle; other agents followed Kashaun on the ground to conduct a traffic stop of his vehicle; Det. Larson and Det. Taylor maintained their physical presence near Kashaun's residence in separate unmarked vehicles; and OPD Task Force Officer Chad Wiebers remotely maintained video surveillance of Kashaun's residence via the pole cam. (TR. 16-18, 47-49, 60-61, 74; Ex. 3-5 - Pole cam video of Kashaun's

residence, Cameras 1 through 3). Officers effectuated a traffic stop of Kashaun's vehicle as planned; Kashaun initially stopped, but then drove off at a high rate of speed. (Ex. 2 at 9:20-10:42 - Aerial Surveillance). All task force agents kept in contact with each other via radio and were able to apprise each other of events as they were unfolding, including Kashaun's flight from law enforcement. (TR. 17-18, 36-37, 50; see also, Ex. 2).[1]

As Kashaun was fleeing police, Officer Wiebers radioed his observation that Gary had come out the front door of Kashaun's residence and looked around in all directions before returning inside. Shortly thereafter, Officer Wiebers radioed that he observed Gary and Defendant both run out of the residence and advised, "He's got something in his waistband."[2] Officer Wiebers radioed his observation that Defendant ran southwards through the residence's driveway to the tree line in a wooded, bushy area next to the residence and stated, "they're hiding something in the trees, yep, he's hiding something in the trees." (Ex. 2 at 13:00-31). Based on the investigation up to that point and the timing of Defendant's actions with Kashaun's flight from police, Det. Larson testified he believed Defendant was attempting to hide or discard evidence. (TR. 19, 37-39, 51-52, 63-64, 75-76; Ex. 4 at 1:30-2:10).

After receiving the above information over the radio, Det. Taylor and Det. Larson quickly drove from their positions to Kashaun's residence, exited their vehicles with guns drawn, announced they were police, and ran towards Defendant and Gary in the driveway. Defendant and Gary immediately complied with the detectives' commands to get on the ground and were handcuffed and patted down for weapons. (TR. 52-53, 65-66, 77, 88-89; Ex. 3 at 14:55; Ex. 4 at 2:18). Det. Larson testified he did not locate anything on Defendant's person that he took into his possession after the pat down.[3] (TR. 67). Det. Larson testified he placed Defendant in handcuffs for officer safety, to investigate the area where Defendant appeared to place something in the

---

[1] Det. Ramsay testified that during Kashaun's flight from law enforcement, Kashaun made a FaceTime phone call to Gary, but Det. Ramsay does not know the content of that conversation. Det. Ramsay also did not know Kashaun had placed this call until later in the investigation. (TR. 38-39, 43-44).

[2] The testifying detectives believed the surveilling agent advised that Defendant was carrying something in his hands, although review of the radio chatter contained in Exhibit 2 reflects that Officer Wiebers said, "waistband." (TR. 51, 62, 87).

[3] During Det. Larson's cross-examination, counsel for Defendant suggested that the surveillance video of Defendant's initial pat down reflects Defendant's black cell phone was taken from his person at this time. After review, the undersigned magistrate judge finds that the surveillance video, which is slightly grainy, does not clearly depict Det. Larson recovering anything from Defendant's person. (Ex. 4 at 2:26-3:52).

bushes, and because Det. Larson did not know if anyone was still inside the residence. The detectives seated Defendant and Gary on the lawn while Det. Taylor radioed for back-up. (TR. 53-55, 68, 78; Ex. 3 at 16:45). Det. Taylor testified he did not immediately search the bushy area because it would have been unsafe to leave Det. Larson alone with two individuals until back-up arrived. (TR. 79). Det. Larson testified he did not conduct any questioning of Defendant or Gary during this time, other than to ask if they had identification. (TR. 68-69).

Within minutes, two additional gang detectives arrived on the scene in a marked cruiser. (TR. 55; Ex. 3 at 19:55). Det. Larson turned Defendant over to the arriving officers, who placed Defendant in the back of their cruiser that was parked on the street at the end of the driveway. Det. Taylor then proceeded to investigate the bushy area where surveillance had seen Defendant discard something.[4] (Ex. 3 at 20:15; Ex. 4 at 7:45). In the bushy area, Det. Taylor recovered a Glock handgun with an extended magazine, a white charging cord, and a plastic bag with a white crystal substance in it that appeared consistent with methamphetamine. (TR. 19-20, 78-81; Ex. 6-12). Det. Taylor's discovery was radioed to the other task force officers, and Defendant was placed under arrest. (TR. 56). Subsequently, two phones were recovered from Defendant's person: a black Apple iPhone and an Alcatel cell phone. Det. Ramsay sought and received a search warrant to access the contents of these cell phones. (TR. 20; Ex. 13). Det. Ramsay also sought and received a search warrant to obtain Defendant's DNA. (TR. 20-21; Ex. 14).

Defendant now moves to suppress all evidence "obtained as a result of the Safe Streets Task Force's contact with Defendant" on June 14, 2021. (Filing No. 109). Specifically, Defendant seeks suppression of: (1) the methamphetamine and the firearm found in the bushy area; (2) the contents of the black Apple iPhone and black Alcatel flip phone obtained pursuant to a search warrant; and (3) the results of DNA analysis performed on DNA obtained from Defendant pursuant to a search warrant. (Filing No. 110 at p. 20). Defendant asserts he was warrantlessly arrested without probable cause the moment the task force detectives approached him with guns drawn and

---

[4] Counsel for Defendant seems to contend the surveillance video reflects Defendant and Gary were transported away from the scene in marked cruisers before Det. Taylor searched the bushy area. (TR. 69-70, 93-94). The undersigned magistrate has reviewed the surveillance videos contained in Exhibits 3 and 4, which do not support that characterization of the evidence. As soon as the back-up officers arrived and led Defendant to the marked cruiser parked on the street, Det. Taylor headed towards the bushy area. (Ex. 4 at 7:45). Det. Larson also headed towards the bushy area once Gary was secured by additional officers. (*Id.* at 9:42). The marked cruisers containing Defendant and Gary remained parked on the scene during the entirety of the surveillance footage, including when Det. Taylor exited the bushy area and began to drive away from the scene. (Ex. 3 at 24:45-25:58).

handcuffed him, and that all evidence described above—including the evidence obtained pursuant to the search warrants—should be suppressed as fruit of his illegal arrest. (Filing No. 110).

The government first asserts Defendant does not have standing to challenge the recovery of the methamphetamine and firearm found in the bushy area because the items were abandoned. (Filing No. 112 at pp. 6-7). The government further contends law enforcement had reasonable suspicion to temporarily detain Defendant to investigate what he threw into the bushy area, that his temporary detention was not a *de facto* arrest when he was placed in handcuffs, and that probable cause existed to warrantlessly arrest him once the methamphetamine and firearm were recovered from the bushy area. (*Id.* at pp. 7-14). Finally, although Defendant does not directly challenge the search warrants, the government asserts both are supported by probable cause and/or officers relied on the warrants in good faith. (*Id.* at pp. 14-15).

## ANALYSIS

Defendant seeks suppression of all evidence in this case *solely* on the basis that the methamphetamine and firearm recovered by law enforcement in the bushy area were the fruit of his illegal arrest. (Filing No. 110 at p. 19). Defendant does not really dispute that once law enforcement recovered suspected methamphetamine and the firearm together in the bushes, probable cause existed for his warrantless arrest (he just contends his warrantless arrest occurred prior to such recovery). See *United States v. Winarske*, 715 F.3d 1063, 1066 (8th Cir. 2013) ("A warrantless arrest by law enforcement is reasonable where there is probable cause to believe that someone has committed or is committing a crime. . . . Arresting officers are not required to witness actual criminal activity or have collected enough evidence so as to justify a conviction for there to be a legitimate finding of probable cause to justify a warrantless arrest."). Defendant also does not dispute that his cell phones could be seized from his person following a valid arrest (but again, he only contends his phones were seized pursuant to his illegal arrest). See *United States v. Robinson,* 414 U.S. 218, 226 (1973) ("If an officer has arrested the individual, the officer may search the individual's person incident to that arrest and may reach into his pockets."). Finally, Defendant does not challenge the validity of the court-authorized search warrants for his cell phones or DNA, other than to assert those warrants were also fruit of the evidence recovered from the bushes, which was fruit of his illegal arrest. (Filing No. 110 at p. 6). Therefore, the only issue

the undersigned magistrate judge must really determine is whether law enforcement's recovery of the methamphetamine and firearm from the bushes was constitutionally permissible.

First, the undersigned magistrate judge finds task force agents clearly had reasonable suspicion to conduct an investigatory stop of Defendant. The Fourth Amendment permits police to "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *United States v. Collins*, 883 F.3d 1029, 1031-32 (8th Cir. 2018); see also *Terry v. Ohio*, 392 U.S. 1, 30 (1968). "In developing this suspicion, officers may 'rely on information provided by other officers as well as any information known to the team of officers conducting the investigation.'" *United States v. Johnson*, 31 F.4th 618, 622 (8th Cir. 2022) (quoting *United States v. Allen*, 705 F.3d 367, 370 (8th Cir. 2013)). "Courts must consider the totality of the circumstances when making reasonable-suspicion determinations to decide whether the detaining officer had a particularized and objective basis for suspecting wrongdoing." *Id.* (citing *Pollreis v. Marzolf*, 9 F.4th 737, 744 (8th Cir. 2021)). "Factors that may reasonably lead an experienced officer to investigate include time of day or night, location of the suspect parties, and the parties' behavior when they become aware of the officer's presence." *Collins*, 883 F.3d at 1032 (8th Cir. 2018) (quoting *United States v. Quinn*, 812 F.3d 694, 697-98 (8th Cir. 2016)).

At the time the task force agents first detained Defendant, they had the following information: during the task force's several-month investigation of a known drug dealer and gang member, Kashaun, Defendant was seen at Kashaun's house 12 to 14 times; an intercepted phone call between Defendant and Kashaun reflects Defendant had knowledge of Kashaun's drug dealing activities; Kashaun's brother, Gary, was involved in Kashaun's drug dealing activities and had provided methamphetamine to a CI during a controlled buy; on the day the task force attempted to effectuate Kashaun's arrest, Kashaun fled from police; as Kashaun was fleeing police, the task force agent monitoring the video surveillance of Kashaun's residence saw Gary and Defendant run out of Kashaun's residence together; and the surveilling task force agent saw Defendant had something in his waistband and watched Defendant run towards the tree line to seemingly hide that item in the bushes. The totality of these circumstances certainly provided law enforcement with an objectively reasonable belief that criminal activity was afoot.

But, Defendant contends his detention was a *de facto* arrest because the task force agents aggressively approached him with their weapons drawn, patted him down, handcuffed him immediately, placed him in a police cruiser, and did not "briefly" detain him. (Filing No. 110 at

pp. 14-16). "A *Terry* stop may become an arrest, requiring probable cause, if the stop lasts for an unreasonably long time or if officers use unreasonable force." *Johnson*, 31 F.4th at 623 (quoting *Waters v. Madson*, 921 F.3d 725, 737 (8th Cir. 2019)). "Officers may, however, take reasonable measures to protect their safety such as 'brandish[ing] weapons or even constrain[ing] the suspect with handcuffs in order to control the scene' while conducting a stop." *Id.* (quoting *United States v. Sanford*, 813 F.3d 708, 713 (8th Cir. 2016)). "In determining the reasonableness of such actions, 'the issue is whether the officer has an objectively reasonable concern for officer safety or suspicion of danger.'" *Id.* (quoting *Sanford*, 813 F.3d at 713). Factors to consider in determining whether an investigative stop has become an arrest include:

> (1) the number of officers and police cars involved; (2) the nature of the crime and whether there is reason to believe the suspect might be armed; (3) the strength of the officers' articulable, objective suspicions; (4) the erratic behavior of or suspicious movements by the persons under observation; and (5) the need for immediate action by the officers and lack of opportunity for them to have made the stop in less threatening circumstances.

*Id.* (quoting *Pollreis v. Marzolf*, 9 F.4th 737, 745 (8th Cir. 2021)).

Under the circumstances, the undersigned magistrate judge finds the task force agents' protective actions did not turn Defendant's detention into an arrest. There were two suspects and only two officers at the scene. See *United States v. Navarrete-Barron*, 192 F.3d 786, 791 (8th Cir. 1999) (handcuffing and placement in squad car was reasonable where there were two officers and two suspects). As discussed above, the task force's several-month investigation implicated both Gary and Defendant in Kashaun's drug dealing activities. Kashaun was in the process of fleeing from police on a high speed car chase at the same time task force agents saw Defendant and Gary run out of Kashaun's house together and appear to hide something in the bushes. Law enforcement knew of Kashaun and Gary's gang affiliations and criminal history that included gang violence. True, the task force did not have information that Defendant himself was affiliated with a gang or otherwise had a criminal history involving violence. But, given his close association to Kashaun and Gary and their actions when it became apparent police were onto them, it was objectively reasonable for officers to be concerned for their safety and act accordingly. See, e.g., *United States v. Tucker*, 821 F. App'x 659, 661 (8th Cir. 2020) (officers' knowledge that a drug dealer's "associates were often armed" supported pat down search of the defendant, who had been seen in proximity to the drug dealer); *United States v. Bustos-Torres*, 396 F.3d 935, 943 (8th Cir. 2005)

7

("Because weapons and violence are frequently associated with drug transactions, it is reasonable for an officer to believe a person may be armed and dangerous when the person is suspected of being involved in a drug transaction.").

However, the above discussion is largely academic because even assuming Defendant's initial detention by law enforcement was in fact a *de facto* arrest without probable cause, Defendant has not met his burden of establishing the requisite nexus between his detention and the evidence recovered from the bushy area, or that he has standing to challenge the search of the bushes.

"Evidence should not be excluded from trial based on a constitutional violation unless the illegality is at least a but-for cause of obtaining the evidence." *United States v. Olivera-Mendez*, 484 F.3d 505, 511 (8th Cir. 2007) (citing *Hudson v. Michigan*, 547 U.S. 586, 592 (2006)). The defendant "bears the initial burden of establishing the factual nexus between the constitutional violation and the challenged evidence." *United States v. Reed*, 921 F.3d 751, 755 (8th Cir. 2019) (quoting *United States v. Riesselman*, 646 F.3d 1072, 1079 (8th Cir. 2011)). "Once the defendant comes forward with specific evidence demonstrating taint, the ultimate burden of persuasion to show the evidence is untainted lies with the government." *Riesselman*, 646 F.3d at 1079 (citing *Alderman v. United States*, 394 U.S. 165, 183 (1969)).

Here, the record establishes that the methamphetamine and firearm recovered from the bushy area were not obtained as a result or as "fruit" of Defendant's detention, as nothing that occurred during Defendant's detention led to law enforcement's discovery and recovery of those items. Before the task force made any contact with Defendant, the task force agent monitoring the video surveillance of Kashaun's residence saw Gary and Defendant run out of Kashaun's residence shortly after Kashaun fled from police; the surveilling task force agent saw that Defendant had something in his waistband, saw Defendant run towards the tree line to seemingly hide that item in the bushes, and communicated that information to the other task force agents over the radio. Based on the several-month long investigation into Kashaun's drug dealing activities and the timing of Gary and Defendant's actions with Kashaun's flight from law enforcement, the task force agents believed Defendant had attempted to hide evidence in the bushes and intended to search the area as soon as possible—before ever making contact with Defendant. (Ex. 2 at 13:00-13:31; TR. 63-64, 79). Det. Taylor testified the only reason he did not immediately search the bushy area when he arrived on the scene was because he did not believe it would be safe to leave Det. Larson alone with two individuals until back-up arrived. (TR. 79). After Defendant was detained, the

task force agents did not ask him any questions about the bushy area or otherwise obtain any additional information regarding what the surveilling agent had already observed and communicated to the other agents. In other words, law enforcement gained nothing in furtherance of the bush investigation from Defendant's detention, aside from perceived officer safety.

Defendant simply asserts he was illegally arrested the moment law enforcement made contact with him, and incriminating evidence was recovered in the bushes outside someone else's residence by law enforcement shortly thereafter, but otherwise offers no facts to establish the requisite nexus between the claimed constitutional violation and the challenged evidence. Defendant's detention did not lead to law enforcement's discovery of the items in the bushes and was not a but-for cause of obtaining that evidence, and therefore suppression of that evidence is unwarranted, regardless of whether Defendant's initial detention violated the Fourth Amendment. See, e.g., *Riesselman*, 646 F.3d at 1079 (agreeing with the district court's conclusion that, although the pat-down search of the defendant violated the Fourth Amendment, suppression of his incriminating statements made after drugs were found on his person was not required because the defendant failed to "provide sufficient evidence to prove a nexus between the illegal search of his person and his [incriminating] statements made to the officers."); see also *Reed*, 921 F.3d at 756.

And, had Defendant's detention not occurred, task force agents still would have been free to search the bushy area to recover any evidence they found there. Defendant does not claim he lived at Kashaun's residence or otherwise assert he has any possessory interest or other reasonable expectation of privacy in the bushy area of the property to establish he has standing to challenge the search of that area. See *United States v. Bearden*, 780 F.3d 887, 892 (8th Cir. 2015) ("A person challenging the constitutionality of a search must demonstrate a reasonable expectation of privacy in the particular area to be searched," which requires a defendant to show "(1) he himself asserted a subjective expectation of privacy in the place searched or object seized, and (2) his subjective expectation is objectively reasonable."). The Fourth Amendment permits an officer to seize an object without a warrant under the plain-view doctrine if "(1) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed, (2) the object's incriminating character is immediately apparent, and (3) the officer has a lawful right of access to the object itself." *United States v. Mattox*, 27 F.4th 668, 673-74 (8th Cir. 2022) (quoting *United States v. Vinson*, 805 F.3d 1150, 1152 (8th Cir. 2015)). Here, a task force officer watching video surveillance of someone else's residence saw Defendant act suspiciously and seemingly hide

something in the bushes at the edge of the driveway. This video surveillance did not violate Defendant's Fourth Amendment rights. Officers were free at any point to walk to the bushes to conduct a search, with or without Defendant on the scene. And, the firearm and methamphetamine were left out in the open in the bushes. (See Ex. 6-10). As such, Defendant has not established he has standing to challenge the search of the bushes at all.

Having found law enforcement did not obtain the evidence from the bushes in violation of Defendant's Fourth Amendment rights, the undersigned magistrate judge finds Defendant's motion to suppress should be denied in its entirety. Upon consideration,

**IT IS HEREBY RECOMMENDED** to Robert F. Rossiter Jr., Chief United States District Court Judge, that Defendant's Amended Motion to Suppress (Filing No. 109) be denied.

Dated this 26th day of May, 2022.

BY THE COURT:

s/ Michael D. Nelson
United States Magistrate Judge

**ADMONITION**

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.